**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**TRAVIS M. CARLISLE**                                                                              **PLAINTIFF**

**V.**                                      **CASE NO. 5:18-CV-05056**

**DEPUTY CHARLEY A. LONG, et al.**                                          **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

Travis M. Carlisle proceeds in this matter *pro se* and *in forma pauperis* pursuant to 42 U.S.C. § 1983. In his Amended Complaint, Plaintiff alleges claims of excessive force, denial of medical care, and retaliation. (Doc. 16). Plaintiff is incarcerated in the Benton County Detention Center.

There are two motions for summary judgment pending: Separate Defendant Heather Trimmer filed for summary judgment on December 3, 2018 (Doc. 27); and Benton County Defendants Sheriff Shawn Holloway, Deputy Charley A. Long, and Deputy Alex Tucker filed for summary judgment on December 5, 2018 (Doc. 31). The Court entered two Orders directing the Plaintiff to respond to the Motions. Plaintiff's responses were due by December 26, 2018 and December 31, 2018, respectively. (Docs. 30, 34).

Plaintiff did not file a response to either of the motions for summary judgment. He also failed to request any extension of time to file his response, and no mail has been returned as undeliverable. Accordingly, Plaintiff has failed to comply with the Court's Orders. Plaintiff was advised that failure to comply with the Court's Orders to respond to the motions would result in: (a) all of the facts set forth by the Defendants in the summary judgment papers being deemed admitted by Plaintiff, pursuant to Local Rule 56.1(c); and/or, (b) this case being subject to dismissal without prejudice, pursuant to Local Rule 5.5(c)(2). (Docs. 30, 34).

1

However, in the course of ruling on summary judgment, the Court must consider the facts set forth in Plaintiff's verified Amended Complaint. A verified complaint is the equivalent of an affidavit for summary judgment purposes. *See, e.g., Roberson v. Hayti Police Dep't.*, 241 F.3d 992, 994-95 (8th Cir. 2001). As the Court in *Roberson* points out, "[a]lthough a party may not generally rest on his pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a responsive affidavit to survive the summary judgment motion." *Id.* The Court must therefore "piece[] together [Plaintiff's] version of the facts from the verified complaint. Those portions of the Defendant[s'] statement of material facts that do not conflict with [Plaintiff's verified complaint] are deemed admitted." *McClanahan v. Young*, 2016 WL 520983, at *1 (D.S.D. Feb. 5, 2016).

## I. BACKGROUND

The Plaintiff was booked into the Benton County Detention Center ("BCDC") on or about December 26, 2018. At intake, Plaintiff informed BCDC personnel of a recent injury he sustained to his shoulder/rotator cuff. (Doc. 33, Ex. A3 at 3). On January 8, 2018, Plaintiff's probation was revoked, and he received a six-month sentence. (Doc. 16 at 4).

On January 10, 2018, Deputy Benjamin Vinson, Jr. submitted a Jail Incident Report involving Plaintiff which read:

> On January 9, 2018, I, Deputy Vinson, was assigned to D-pod. At approximately 2030 hours, Inmate Carlisle, Travis pushed the emergency intercom button and stated that his cellie (sic) needed an extra blanket due to him being in a corner cell. I then got informed that corner cells no longer got an extra blanket due to the heat being turned up. When I told Inmate Carlisle that information he began to yell and curse over the intercom. I made the decision to talk to Inmate Carlisle about his behavior. I went to his door and told him to come out to pod control. While going to the pod door, Inmate Carlisle began to yell and be disruptive. While at pod control, I told Inmate Carlisle to face the wall and place his hands behind his back to which he did not fully comply. I then grabbed the back of his shirt and placed him on the wall for being non-compliant. I tried several times to be rational and speak to him about his actions, but he wouldn't stop yelling.

2

When he calmed down and stopped yelling, I informed him that his behavior would not be tolerated. After we spoke about his behavior, I told him that he was to go to his cell and that if he didn't stop being disruptive, I would lock him down. Inmate Carlisle returned to cell and I returned to my normal duties with no further incidents.

(Doc. 33, Ex. A4 at 1).

On February 7, 2018, Plaintiff submitted an Inmate Grievance, stating:

There is mail that I'm not getting on kiosk. The last letter that I got was postmarked the 1st of this month and I just got it today and theres 2 before that one that I still haven't got. I need this figured out and I need to figure out what to do and a number to call so I can give it to my mom so she can figure this stuff out.

(Doc. 33, Ex. A2 at 5). Lt. Greg Stevenson responded to Plaintiff's grievance, stating:

"When the letters are received at the mail guard facility, it is scanned in. We are not informed when letters are scanned in." *Id.*

On February 23, 2018, Deputy Alex Tucker submitted a Jail Incident Report, which read:

On February 23, 2018 at approximately 0820 hours, I, Deputy Tucker was assigned to Dpod. I was passing blankets and sheets back to pod D-149 when I observed in cell 143 a pillow that had been ripped open and tied closed. Upon further inspection the pillow was stuffed with two blankets, I then confiscated the pillow and moved on to the next cell when Inmate Carlisle, Travis began yelling at me and becoming aggravated that I took his pillow. I calmly informed him that I was taking his pillow because of the alterations that were made to it (in the inmate handbook it states that any commissary that has been altered becomes contraband). As well as the blankets hid inside of it. As I was leaving the pod Inmate Carlisle then shouted 'I better get my pillow back or we are going to have problems' and that he wasn't going to stop until he gets a lieutenant down here. I then informed pod control of the situation and that we need to inform our chain of command so that we are all on the same page. While waiting on Corporal Smith Inmate Carlisle began shouting at the door yelling 'I'm not the mother f***er y'all want to mess with' and once we were at the pod door explaining the situation to Corporal Smith Inmate Carlisle began making the 'finger gun' sign and pretended to shoot us through the glass. That's when we decided this has gone far enough and stacked up at the door to pull him put of the pod. Deputy Long stacked up first in line followed by myself, Deputy Massey, and Deputy Allen with Corporal Smith opening the door for us.

Deputy Long made first contact and grabbed Inmate Carlisle's left arm to restrain him, as I entered Inmate Carlisle pulled back to swing at Deputy Long I was able to restrain his right arm before he made contact. Once we gained control we took Inmate Carlisle and placed him on the floor, Inmate Carlisle began resisting and trying to tuck his arms under himself. I then used my forearm and applied targeted pressure to the right side of his head against the floor as a distraction technique so myself and Deputy Long could gain easier access to his arms in order to control the situation. We then gained control of his arms and placed his arms behind his back. Corporal Smith then knelt on Inmate Carlisle's torso behind us and assisted in placing hand cuffs on Inmate Carlisle. We then turned Inmate Carlisle on his side and helped him to his feet I then assisted Corporal Smith in escorting him down the E-pod sliding door. I then went through the rest of my shift duties without incident.

(Doc. 33, Ex. A4 at 2).

Deputy Robert Massey also submitted a Jail Incident Report involving Plaintiff on February 23, 2018, which read:

On February 23, 2018, I, Deputy Massey, was assigned to Rover. At approximately 0820 hours, I was checking to see if the deputies in Delta Pod needed help with anything. I was informed that Inmate Carlisle, Travis was standing near the door yelling obscenities through the pod door at the deputies in Pod Control. The decision was made to stack on the door. When the door was opened Deputy Long and Tucker gained control of Inmate Carlisle and placed him on the floor. During this time, I began to yell 'everyone get on the ground and face the ground.' The inmates in the pod complied with the order given. Once Inmate Carlisle was escorted out of the pod I asked Pod Control to group release D149. Once group was released all of the inmates in the pod were placed into their cell. I returned to my duties with no further incidents.

*Id*. at 3.

The Benton County Defendants submitted a video that depicts the event that took place in the jail from 8:13:20 a.m. to 8:42:18 a.m. on the day of the incident. (Doc. 33, Ex. A7). The video includes six (6) different views: Pod D Hallway, Pod E Hallway, Pod E Control – A, Pod D Control, Pod D-149, and Pod E-102. The incident occurred inside Pod D-149. The Pod D-149 camera shows the following:

- 8:13:20 – 8:15:27: Deputy Alex Tucker stands outside a jail cell, assisting in the distribution of sheets and blankets to BCDC inmates.

- 8:15:28 – 8:15:31: Deputy Tucker enters Plaintiff's jail cell and confiscates a pillow from Plaintiff's jail cell.

- 8:15:32 – 8:16:07: Deputy Tucker exits Plaintiff's jail cell with the confiscated pillow and proceeds towards the Pod D-149 Control Room door.

- 8:16:08 – 8:18:16: As Deputy Tucker nears the Pod D-149 Control Room door, Plaintiff confronts Deputy Tucker. Plaintiff continues to confront Deputy Tucker, even after Deputy Tucker places the confiscated pillow in the Pod D-149 control room. Deputy Tucker then climbs the stairs to the second floor of the Pod, and Plaintiff engages him from the ground floor, gesturing up at Deputy Tucker and waving his arms and pointing.

- 8:18:17 – 8:18:28: Plaintiff climbs the stairs to the second floor of Pod D-149 while Deputy Tucker continues to assist in the distribution of sheets and blankets. Plaintiff approaches Deputy Tucker and appears to engage him dialogue.

- 8:18:29 – 8:21:00: Deputy Tucker finishes distributing sheets and blankets and then exits Pod D-149 via the Control Room door, with Plaintiff following closely behind. Plaintiff continues to swing his arms and gesture toward Deputy Tucker, even though the officer has exited the room.

- 8:21:00 – 8:25:45: Plaintiff stands behind the red line for several minutes, apparently attempting to confront Deputy Tucker and/or other BCDC personnel who are behind the glass door and windows.

- 8:25:46 – 8:25:49: Plaintiff makes a gesture with his hand, using his index finger in a flat, pointed position and his other fingers folded beneath it, apparently towards BCDC personnel who are behind the glass.

- 8:25:50 – 8:30:19: Plaintiff continues to wait at the red line, attempting to confront BCDC personnel.

- 8:30:20 – 8:30:22: Plaintiff makes the same or similar pointing gesture towards BCDC personnel.

- 8:30:23 - 8:31:08: Plaintiff continues to remain positioned in front of the Pod D-149 Control Room door. At times Plaintiff crosses over the red line on the Pod floor.

- 8:31:09 – 8:31:48: Plaintiff a pointing gesture again towards BCDC personnel and engages in dialogue with various inmates. Plaintiff hits one of his fists against his open palm and appears to be laughing to the other inmates.

- 8:31:49 - 8:32:23: BCDC personnel enter the Pod D-149 common area. Deputies Tucker and Long attempt to physically restrain Plaintiff.

- 8:32:24 - 8:32:27: Deputies Tucker and Long gain control of Plaintiff, placing his arms and hands behind his back.

- 8:32:28 – 8:32:49: Deputies Tucker and Long place hand restraints on Plaintiff.

- 8:32:50 – 8:33:12: Plaintiff is rolled onto his side, helped to his feet, and escorted out of the Pod D-149 common area.

(Doc. 33, Ex. A7, Video File Pod D-149).

On February 23, 2018, Plaintiff submitted an Inmate Grievance, stating,

The deputies used excessive force and slammed me in the ground when I never made a threatening gesture or move towards them. I told them I'm not going to stop yelling to talk to a "LT" until I talk to one. And Deputy Long laughed in my face after he slammed me saying I threatened them when I never made a violent or death threat towards them. You can ask D-149 if I made any violent remark to the police prior to them slamming me. I was waiting at Pod door when they came in and slammed me. It was Deputies Long and Tucker. They wouldn't tell me when I asked for their full names for my lawsuit which is interfering in a legal lawsuit.

In response, Lt. Robin Holt informed Plaintiff the matter "will be looked into." (Doc. 33, Ex. A2 at 8).

Plaintiff testified that prior to the altercation, he was standing inside the red line that was painted on the floor and was "at the door telling them I need to speak to a lieutenant or captain or sergeant." (Doc. 33, Ex. B at 28). Plaintiff testified that he did not use an aggressive tone towards the officers but was yelling due to it being loud in the jail. *Id.* at 35. Plaintiff testified that prior to the guards entering the pod, he had stopped yelling and was standing on the correct side of the red line. *Id.* at 29-30. Plaintiff testified that he informed the BCDC deputies that he was someone they did not want to mess with, but he did not use derogatory language towards them. *Id.* at 30-31. Plaintiff further testified

that he was using his index finger to count the guards gathered at the pod door, rather than making a gun gesture at the guards.  *Id.* at 24-27.

Plaintiff testified that he put his hands in the air when deputies entered the pod. *Id.* at 40.  Nevertheless, according to Plaintiff, the deputies attempted to force his arms behind his back, and he informed them that he had issues with his shoulder.  *Id.* at 40-41.  Plaintiff testified that Deputy Long entered the pod first and took him to the ground and twisted his arm.  Plaintiff further testified that Long slammed him to the ground, placing his knee on Plaintiff's head.  *Id.* at 44-45.  Plaintiff testified that he did not attempt to resist the deputies' attempts to place his arms behind his back.  *Id.* at 40-45.

Plaintiff alleges that on the morning of February 23, 2018, he pressed the call button to seek medical assistance.  Plaintiff further alleges that Heather Trimmer informed him that he would be seen by the jail doctor at doctor call that afternoon.  (Doc. 16 at 6). Plaintiff states that he had to wait for doctor call for several hours and that he wanted to be seen for a possible concussion and for his shoulder.  *Id.*  Plaintiff further states that he told the deputies that he was "seeing double, feeling nauseous, getting migraines" and that his eye was twitching.  *Id.* at 10.

On February 23, 2018, and at all times relevant, Trimmer was a nurse employed by Southern Health Partners, which provides medical services to inmates housed at BCDC through a contract with Benton County, Arkansas.  (Doc. 29, Ex. 1 at 1).  As a nurse, Trimmer could not prescribe medications.  *Id.* at 2.

According to Trimmer's affidavit testimony, it was the routine practice of the jail doctor to visit the BCDC every Friday at 12:30 p.m. to see inmates.  *Id.* at 2.  Trimmer

testified that she is familiar with this routine practice of the jail doctor and also noted that February 23, 2018 was a Friday.  *Id.*

On February 23, 2018, Plaintiff was medically evaluated by the BCDC medical staff.  (Doc. 33, Ex. A3 at 31-32).  Trimmer testified that the Plaintiff was seen by the jail doctor the afternoon of February 23, 2018, for his alleged injuries and for evaluation of an old scar on his right foot, which he alleged was "scabbing over" and breaking out into sores.  (Doc. 29, Ex. 1 at 1-2).  During the doctor call, the jail doctor noted no soft tissue swelling, pupils equal and reactive to light, and mild redness to the allegedly injured areas.  The jail doctor also noted "nausea status post head contusion."[1]  *Id.* at 2.  Plaintiff was prescribed one dose of Zofran, a medication administered for nausea.  With regard to his right foot scar, Plaintiff was prescribed Bactroban[2] ointment for ten days or until healed.  (Doc. 29, Ex. 1 at 2; Doc. 33, Ex. A3 at 31-32).  According to Trimmer's affidavit, the findings of the jail doctor indicated that there was no evidence of a concussion or closed head injury.  (Doc. 29, Ex. 1 at 2).

Plaintiff testified that he was evaluated by the BCDC physician approximately eight (8) hours after the incident.  According to Plaintiff, the BCDC physician told him he was okay at that time.  (Doc. 33, Ex. B at 43, 56-57).

On February 23, 2018, Plaintiff submitted an Inmate Request, stating: "It won't let me check my emails or let me look at my pictures, but it will let me look at my postal mail."  In response, Sgt. McLain informed Plaintiff he would rehouse him in an attempt to remedy the matter.  (Doc. 33, Ex. A2 at 9).

---

[1] A contusion is a bruise.  *Id.* at 2.
[2] Bactroban is a topical antibiotic ointment.  (Doc. 29, Ex. 1 at 2).

On February 24, 2018, Deputy Charley Long submitted a Supplemental Jail Incident Report involving Plaintiff, which read:

> On February 23, 2018, at approximately 0830, I, Deputy Long, was informed by the Pod Control Deputy that there was an Inmate at the D–149 pod door yelling and making threats. I walked to the pod door and Inmate Carlisle, Travis was at the pod door past the red line yelling. Inmate Carlisle was yelling about a pillow and making threats towards deputies, making comments such as he will knock out the first deputy through the door if they don't have his pillow and saying he is not the mother f***er you want to mess with. Pod Control Deputy, Deputy Sisco call for Corporal Smith to come to Delta pod. When Corporal Smith arrived we were standing by the door as I was explaining the situation to him and Inmate Carlisle simulated with his hand that he was going to shoot each one of us deputies and saying bang each time he gestured with his hand pointed at us. I then decided we needed to take Inmate Carlisle out of the pod for everyone's safety. With all the threats Inmate Carlisle had just made and was currently making we decided to close the distance and take control of him as fast and as safe as possible to prevent giving him the opportunity to hurt a deputy. Corporal Smith opened the door and I, Deputy Long, took control of Inmate Carlisle's left arm. Inmate Carlisle instantly tensed up and began to pull his right fist back as of to throw a punch. I then took Inmate Carlisle's back to prevent from getting hit and still maintain control of him while Deputy Tucker took control over his right arm. As soon as Deputy Tucker had control of Inmate Carlisle's arm I regained control over his left arm and we lowered him to ground. After lowering Inmate Carlisle to the ground he attempted to pull his arms under him and would not follow the command to place his arms behind his back. Deputy Tucker and I were both able to get his arms behind his back and Corporal Smith placed hand restraints on him. We then rolled him on his side and helped him to his feet and Corporal Smith escorted him to echo pod. I then returned to my duties in delta pod without further incidence.

(Doc. 33, Ex. A4 at 3).

On February 24, 2018, Plaintiff submitted an Inmate Grievance, stating: "I need to speak to you in person on numerous reasons and concerns, please and thank you. One is about your jail staff long and tucker." (Doc. 33, Ex. A2 at 10). Lt. Robin Holt responded stating, "What do you need to talk about?" *Id.*

Plaintiff submitted another request on February 24, 2018, stating: "It won't let me access my email kiosk. I get 2 free credits and I can't even use them." Lt. Robin Holt responded to Plaintiff's grievance, stating: "When you are on disciplinary segregation, you do not have the privilege of messaging (emails/photo). You still have postal mail for outside contact." *Id.* at 11.

On February 25, 2018, Deputy Shayla Sisco submitted a Supplemental Jail Incident Report involving Plaintiff, stating:

> On February 23, 2018, I, Deputy Sisco was assigned to Delta Pod Control. At approximately 0820 Deputy Tucker began collecting blankets and sheets from inmates in D149. I heard an inmate later identified as Carlisle, Travis yell 'hey' across the pod. I noticed Deputy Tucker was at Inmate Carlisle's cell. I watched Deputy Tucker as he appeared to be telling Inmate Carlisle to stop yelling. Deputy Tucker continued collecting blankets and sheets. When Deputy Tucker and the trustees exited the pod Inmate Carlisle stood at the pod door yelling. I noticed Deputy Tucker was carrying a pillow. He explained that he had removed the pillow from Inmate Carlisle's cell. The pillow was ripped open on one end with two white blankets folded inside. At this time Deputy Long exited D130. Inmate Carlisle began yelling that he wanted to see a Lieutenant, and then began yelling for each of the male deputies that had been in Delta. Inmate Carlisle then yelled, 'I ain't the mother f***er you want to be messing with!' At this time I contacted Corporal Smith and informed him of the situation and that I was going to form a team of available deputies to 'stack up' at the door to make entry. Corporal Smith advised that he would come to Delta to assist. Deputy Massey and Allen were called via radio. Once the deputies had arrived they were briefed on the situation. As they began lining up and forming a plan of entry, Inmate Carlisle made a gun gesture with his hand and 'shot' each of the deputies lined up at the pod door. At Corporal Smith's verbal command I opened the D149 pod door via the panel. Deputies Long and Tucker made entry and placed Inmate Carlisle on the ground. Sergeant Hobelmann and Deputy Massey instructed the other inmates to get on the ground face down. Corporal Smith assisted placed handcuffs on the inmate. Inmate Carlisle was assisted to his feet and brought out to pod control. Corporal Smith and Deputy Tucker escorted Inmate Carlisle to Echo Pod for lockdown. I returned to my duties with no further incident.

(Doc. 33, Ex. A4 at 2-3).

On February 25, 2018, Plaintiff was again evaluated by the BCDC medical staff. (Doc. 33, Ex. A3 at 22).

Plaintiff submitted another inmate grievance on February 25, 2018, stating:

It won't let me access my emails or photos but it will let me check my postal mail. This has been going on since Friday morning when deputies long and tucker slammed me when I never made any kind of threatening moves to them and they said that I made a threatening gesture towards them when all I did was point at all the guards through the window as I was telling an inmate they might want to move because they were getting ready to come in and slam me and that is when I will press charges on them for using excessive force.

Lt. Robin Holt responded to Plaintiff's grievance by stating: "Your messaging privileges (emails and photos) were taken away, due to disciplinary segregation. You are still allowed postal mail." (Doc. 33, Ex. A2 at 11).

Plaintiff also submitted an Inmate Medical Request on February 25, 2018, which stated: "Ever since I was slammed Friday my knees are bruising my shoulder is messed up it hurts to lift it and I told them I can't move it much and they twisted it still. I got medical records showing this. I've been getting migraines also." In response, Nurse Heather Trimmer informed Plaintiff that he had been added to the nurse call list. (Doc. 33, Ex. A2 at 11).

Plaintiff was evaluated by the BCDC medical staff on February 26, 2018. As a result of the medical evaluation, Plaintiff was prescribed 600 mg of Ibuprofen to help alleviate pain. (Doc. 33, Ex. A2 at12; Ex. A3 at 32).

On February 26, 2018, Plaintiff submitted an Inmate Grievance, stating:

I'm not on disciplinary action yet and I never swung or made a threatening gesture towards police all I did was point at how many police were outside the pod door. I show respect and give it when its given to me and I need to talk about these phones. I need that money back from someone else stealing my money off the phone and I want to press charges on whoever it was. Those phones are too close together that it makes it easy to watch someone put their pin numbers in and then they cash out or ask to be with their family then they sell it.

(Doc No. 33, Ex. A2 at 10).

Plaintiff submitted another Inmate Grievance on February 28, 2018, stating: "I'm not on disciplinary action. I haven't been to disciplinary hearing and I need to get an address off an email so I can write a letter. You guys have kept me from it now for 4 days." In response, Plaintiff was informed that he may use the kiosk. *Id.* at 13.

On February 28, 2018, Plaintiff pleaded guilty to threatening jail staff and disruptive conduct, resulting from the February 23, 2018 altercation with BCDC personnel. (Doc. 33, Ex. A4 at 4). Plaintiff was convicted of Terroristic Threatening in the First Degree and Terroristic Threatening in the Second Degree. (Doc. 33, Ex. A1 at 4-5). Plaintiff testified that he pleaded guilty to threatening jail staff and disruptive conduct in order to accept a lesser sentence. (Doc. 33, Ex. B at 52-53).

On March 2, 2018, Plaintiff was prescribed and/or provided Diclofenac and Naproxen 500 mg. (Doc. 33, Ex. A3 at 25).

Plaintiff submitted an Inmate Grievance on March 4, 2018, stating:

I was placed on wound care on 2-23-18 by the doctor. Nurse Trimmer never put me on it or they never brought me down there except one time which was on 3-1-18 at around 2:30-2:45. I'm putting it on paper so it can be documented. I'm supposed to have it cleaned and bactroban put on it.

(Doc. 33, Ex. A2 at 14).

Another Inmate Medical Request was submitted by Plaintiff on March 12, 2018, stating:

I'm breaking out due to the state soap and I now have staph because of it. I have mentioned this numerous times. And now I have staph because no one wants to address this. Its on my throat at that. I just seen the nurse now I need to see the doctor unless you can get them to let me have dial antibacterial soap that they sell on commissary. I don't get money, but I know they can give it, its med.

BCDC medical staff responded to Plaintiff's medical request by stating: "No infection noted anywhere on this individual.  Added to daily [illegible] for dry/cracked skin on left foot until resolved."  *Id.* at 15.

On March 12, 2018, Plaintiff submitted an Inmate Grievance, stating:

> Deputies Cobb and Smith keep waking us up all through the night due to them slamming the door making unnecessary noise at like 1-2 am waking the whole pod up.  We need something done about this.  We only have so many hours with our mat before they take it away from us every morning while on lockdown.  And these deputies keep us awake during that time.  And they are very disrespectful.

Lt. Robin Holt responded to Plaintiff's grievance, stating: "Deputies are required to do headcounts, per statute and policy.  The doors are heavy and close on their own, behind deputies.  Please provide adequate details to the complaint of disrespect."  *Id.* at 16.

On March 19, 2018, Plaintiff submitted an Inmate Medical Request stating, "I need to be placed on Dr. Call so I can see him about me breaking out from state soap and for my foot."  *Id.* at 17.

Plaintiff submitted another Inmate Medical Request on March 20, 2018, stating: "I'm having stomach cramps and sharp pain and they are severely hurting me to the point that I can't sleep at all."  *Id.* at 18.

On March 21, 2018, Plaintiff submitted an Inmate Medical Request, stating:

> Can I please get some Maalox for the stomach cramps from trapped gas in my digestive system and some Dulcolax to try and help me get it.  Maalox was given to me today when I went to sick call this morning and it helped some.  Please and thank you.

In response, Nurse Shawna Stephens informed Plaintiff that he had been added to the nurse call list.  *Id.* at 20.  Plaintiff was evaluated by the BCDC nursing staff and was prescribed and/or provided Milk of Hydroxide and Bisacodyl.  (Doc. 33, Ex. A3 at 23-24).

On March 24, 2018, Plaintiff submitted an Inmate Request, stating: "I'm out of disciplinary segregation and back in d 154.  The messaging kiosks are not letting me access my emails and photos.  Can you please fix this so I can email my mom now?"  In response, Plaintiff was informed that his email and photo access had been restored. (Doc. 33, Ex. A2 at 20).

Another Inmate Grievance was also submitted on March 24, 2018, stating: "I need to have access to my emails on the messaging kiosks.  I just got off disciplinary segregation and its not letting me get my emails and photos.  Please fix this."  In response, Lt. Robin Holt informed Plaintiff the issue had been resolved.  *Id.*

Plaintiff's medical records indicate that he was provided with all medically prescribed medication while he was incarcerated in the BCDC.  (Doc. 33, Ex. A3 at 25-30).  BCDC records also reflect that Plaintiff was regularly provided his incoming mail while incarcerated. (Doc. 33, Ex. A5 at 1-22).

Plaintiff testified that he believes that the BCDC deputies retaliated against him for the lawsuits he has filed against them.  Plaintiff further alleges that Deputies Long and Tucker did not follow the BCDC policy of talking to an inmate prior to using force.  The BCDC has specific policies in place concerning the grievance procedures.  *See* Doc. 33, Ex. A; Ex A6 at 7-8.  Detainees are provided access to an electronic kiosk for purposes of communication with various members of the Sheriff's department and medical staff. Detainees must put all general requests and non-emergency medical requests and all grievances concerning any person or aspect of their confinement on the kiosk.  This informs staff of any purported issue so that it may be addressed or investigated as needed.  (Doc. 33, Ex. A at 2).

It is also the policy of the BCDC that inmates shall not be discriminated against because of their nationality, color, creed, or beliefs. *Id.* The BCDC recognizes that inmates have certain rights relative to the conditions of their confinement, which includes humane treatment, access to medical and dental care when needed, and a healthy, safe and secure environment. (Doc. 33, Ex. A6 at 1-2).

With regard to mail, the BCDC has specific policies in place concerning inmate incoming and outgoing mail procedures. (Doc. 33, Ex A; Ex. A6 at 61-64). A third party vendor processes all incoming, non-legal, mail. The vendor opens the mail, scans it in the system, and makes it available on the kiosk. Jail staff (administrative staff) then review the mail and release it to the inmate for viewing. If there is anything prohibited in the mail (such as pornography), it is rejected. The inmates are allowed to contact the company upon their release to get a copy of the scanned mail. (Doc. 33, Ex. A at 2-3).

BCDC engaged the third party mail processor to help alleviate and hopefully eliminate contraband from entering into the facility by mail. The process also seeks to eliminate claims of inmates who believe that BCDC staff are wrongfully withholding their mail. (Doc. 33, Ex. A at 3).

With regard to the use of force, BCDC has specific policies in place concerning the use of force which require that officers only use the force and restraint necessary to control an inmate who displays violent or threatening behavior. (Doc. 33 at Ex. A; Ex. A6 at 123-124). Any BCDC Officer who willfully mistreats a prisoner is subject to discipline or termination. (Doc. 33, Ex. A; Ex. A6 at 161-162).

Southern Health Partners was the contract medical care provider for the BCDC at the time the Plaintiff was incarcerated there. All medical decisions were made by

Southern Health Partners medical staff. (Doc. 33, Ex. A at 3). No member of the BCDC staff, including the Sheriff, is authorized to make medical decisions on behalf of any detainee (excluding temporary first aid measures if medical staff is not present). Moreover, no BCDC employee is authorized to order medical testing, prescribe medications, or otherwise direct medical treatment for inmates. (Doc. 33, Ex. A at 3-4).

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In this case, the facts set forth by the Defendants are deemed admitted except to the extent contradicted by the verified complaint. The question is whether, given the facts as pieced together by the Court, there are genuine issues of material fact and whether the Defendants are entitled to judgment as a matter of law.

### III. DISCUSSION

Both Heather Trimmer and the Benton County Defendants have filed for summary judgment. Their motions are discussed separately.

### A. Heather Trimmer

Plaintiff names Heather Trimmer in claims 2, 5, 6 and 7 of his Amended Complaint. Plaintiff alleges that Trimmer failed to provide adequate medical care while Plaintiff was incarcerated in the BCDC. Plaintiff sets forth his claims with respect to both Trimmer's personal and official capacities.

Claims 2, 5, and 6 each concern the medical care Plaintiff received for the injuries he allegedly incurred as a result of the incident involving BCDC staff on February 23, 2018. Plaintiff asserts that after he was escorted to lockdown on February 23, 2018, he pushed the call button for medical treatment for a possible concussion and for an injured shoulder. Plaintiff states that he was told that Trimmer said that he would have to wait for doctor's call. Plaintiff was seen at doctor's call several hours later. Plaintiff asserts that because he indicated that he had a possible concussion from hitting his head, was seeing double, was nauseous, and was getting migraines, he should have been seen immediately rather than having to wait several hours.

In Claim 7, Plaintiff asserts that on February 23, 2018, the doctor placed him on "wound care for the scar on his left foot." Plaintiff states that he "was suppose[d] to be seen for 7 days and I was seen for only one day due to Heather Trimmer not following Doctors order telling her to place me on the list." (Doc. 16).

Trimmer argues she is entitled to summary judgment because she was not deliberately indifferent to Plaintiff's serious medical needs.

### 1. Individual Liability

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claims, Plaintiff must prove that the Defendant acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). Intentionally denying or delaying access to medical care may constitute deliberate indifference. *See Estelle*, 429 U.S. at 104-05; *Dulany*, 132 F.3d at 1239. "When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, 'the objective seriousness of the deprivation should also be measured 'by reference to the *effect* of delay in treatment.'" *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quoting *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995) and *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)). "To establish this effect, the inmate 'must place verifying medical evidence in

the record to establish the detrimental effect of delay in medical treatment . . .'" *Laughlin*, 430 F.3d at 929 (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)).

To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted). A plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need." *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact. *Schaub*, 638 F.3d at 914 (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)).

With that framework in mind, the Court now turns to Plaintiff's deliberate indifference claims against Trimmer. As previously discussed, Plaintiff asserts two separate arguments against Trimmer: one concerns Trimmer's response to Plaintiff's request for medical care following an incident which occurred on February 23, 2018, and the other concerns Trimmer's alleged failure to place Plaintiff on the list for wound care as ordered by the doctor.

### a. February 23, 2018 Request for Medical Care

Plaintiff asserts that Trimmer was deliberately indifferent to his medical care when she allegedly instructed that medical attention to Plaintiff could be postponed until the doctor's scheduled visit. Plaintiff asserts that he complained of a possible concussion and should have been seen immediately. Instead, Plaintiff was examined by the doctor several hours later, at the time the doctor routinely visited the jail.

During the doctor call, the jail doctor noted no soft tissue swelling, pupils equal and reactive to light, and mild redness to the allegedly injured areas. Plaintiff was prescribed one dose of Zofran, a medication administered for nausea associated with a head contusion. The undisputed evidence shows that any delay in treatment was minimal, and Plaintiff presents no medical evidence to support a claim that a delay in treatment caused a detrimental effect. Trimmer is entitled to summary judgment with respect to this claim.

### b. Wound Care

Plaintiff also asserts that Trimmer failed to add him to the list to be seen for wound care, as directed by the doctor. Plaintiff asserts that he was only seen once instead of the seven (7) days prescribed by the doctor.

According to the medical records, on February 23, 2018 the doctor prescribed Bactroban, a topical antibiotic ointment, to be applied to Plaintiff's right foot scar for ten days or until healed. The medical records reflect that Plaintiff received Bactroban, as prescribed from February 24, 2018 until March 5, 2018. Trimmer's affidavit testimony further states that she provided all medications that were prescribed for the Plaintiff.

Based on the undisputed evidence submitted, the Court finds that there is no genuine, material dispute of fact to support Plaintiff's claim that Trimmer failed to "add him to the list" to be provided the treatment as prescribed by the doctor.[3] The Court further finds that even if evidence existed in the record showing that Trimmer failed to add Plaintiff to the treatment list, his claim would not survive summary judgment because he "must show more than negligence, more even than gross negligence," *Popoalii*, 512

---

[3] "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

F.3d at 499, and that Trimmer "actually knew of but deliberately disregarded [Plaintiff's] serious medical need," *Gordon*, 454 F.3d 862.

Accordingly, the Court finds that Trimmer is entitled to summary judgment with respect to this claim.

### 2. Official Capacity

Plaintiff also sues Trimmer in her official capacity. When a government contracts with a third party to fulfill a constitutional duty – such as providing medical care – official capacity claims against the third party's employees are treated as claims against the third party itself. *See Cannady v. Cradduck,* 2016 WL 4432704, at *1-2 (W.D. Ark. Aug. 18, 2016) (finding that official capacity claims against employees of a third-party medical provider are treated as claims against the company because the county contracted with the company to provide healthcare to county prisoners). Thus, Plaintiff's official capacity claims against Trimmer are essentially a claim against Trimmer's employer, Southern Health Partners, Inc.

To sustain an official capacity claim against that entity, Plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (discussing a section 1983 claim against a prison medical provider); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993) ("[A] corporation acting under color of state law will only be held liable under section 1983 for its own unconstitutional policies."). Thus, Plaintiff's official capacity claims are "functionally equivalent" to alleging that Defendant's employer, Southern Health Partners, Inc., had "a policy, custom, or [took an] official action" that deprived him of constitutionally adequate medical care. *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010); *Johnson*, 452 F.3d at 973.

Here, Plaintiff has failed to provide evidence of—or even allege the existence of—any policy or custom of Benton County or Southern Health Partners, Inc. that contributed to the alleged violation of his constitutional rights. Accordingly, Trimmer is entitled to summary judgment on Plaintiff's claims against her in her official capacity.

### B. Benton County Defendants

With respect to the Benton County Defendants, Plaintiff asserts claims of excessive force, retaliation, interference with his mail, discrimination, and failure to supervise. The Benton County Defendants believe that they are entitled to summary judgment because: the force used by the officers was reasonable in light of the circumstances; Plaintiff was not denied any constitutional right with regard to his mail; verbal comments do not establish retaliation, discrimination, or any constitutional violation; Sheriff Holloway was not deliberately indifferent to any need for training or supervision; all Defendants are entitled to qualified immunity; and there is no basis for official capacity liability.

### 1. Excessive Force

In Claim 1 of his Amended Complaint, Plaintiff asserts Tucker and Long used excessive force against him in violation of the Eighth Amendment. Plaintiff states, "I was standing at the door telling them, 'I'm not the one check my jacket (nothing violent), I want to speak to someone higher than you Tucker or Long.' Then Tucker and Long came in among with other jail deputies and slammed me on the ground while my hands were in the air in a non-threatening manner and twisted my shoulder while its already messed up and hurt my knee." (Doc. 16 at 5). Plaintiff's Amended Complaint further states: "[o]n 2-23-18 at approximately 8:20 I was slammed by the deputies and my head hit the floor. I

told the deputies that my head hit the floor and that I'm seeing double, feeling nauseous, getting migraines and that my eye hasn't stopped twitching since." *Id.* at 10.

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). "Because the use of force is sometimes required in prison settings, guards are liable only if they are completely unjustified in using force, i.e., they are using it maliciously and sadistically." *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008). Relevant factors to be considered for this inquiry include: "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, . . . any efforts made to temper the severity of a forceful response," and the extent of injury to the inmate. *Hudson*, 503 U.S. at 7 (internal quotations omitted).

"Not every malevolent touch by a prison guard gives rise to a federal cause of action." *Jones,* 207 F.3d at 495. Even with malicious motivation, "not every push or shove violates the Constitution, but any use of force greater than *de minimis,* or any use of force that is 'repugnant to the conscience of mankind,' does." *Irving*, 519 F.3d at 446 (citing *Hudson*, 503 U.S. at 9-10). While significant injury is not required, "some actual injury must be shown" and the extent of inflicted pain considered. *Jones,* 207 F.3d at 495. "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). "[U]nless it appears that the evidence, viewed in the light most favorable

to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Johnson v. Bi-State J. Ctr./Ark. Dept. of Corrs.*, 12 F.3d 133, 136 (8th Cir. 1993).

According to the evidence in the record, there is no genuine, dispute of material fact that the Benton County Defendants' use of force against Plaintiff was applied in anything other than a good faith effort to maintain or restore discipline. Plaintiff had been previously warned about his disruptive behavior. Plaintiff became agitated and appeared angry when Tucker removed Plaintiff's pillow from the Pod area. After Tucker left through the Pod door, Plaintiff began yelling, near the Pod door, at times crossing the red line on the Pod floor. As the jail video of the incident confirms, Plaintiff remained near the Pod door for over ten (10) minutes. Plaintiff can be seen in the video making gestures towards the Defendants and also appears to be engaging other inmates so that they join him in the confrontation.

The officers on the scene made the decision to take control of Plaintiff quickly to ensure the safety of the deputies and the other inmates. Upon entering the Pod, Tucker and Long gained control of Plaintiff in less than a minute. Hand restraints were placed on Plaintiff, and, in less than two minutes, Plaintiff was helped to his feet and escorted out of the Pod. Although the incident occurred very quickly, it is notable that Plaintiff did not (as he claims) place his hands in the air or behind his back prior to contact with the Defendants.

Finally, although Plaintiff asserts that he suffered a possible concussion and hurt his shoulder, a medical exam revealed no signs of concussion, and there is no medical evidence of further trauma to Plaintiff's already injured shoulder as a result of this incident.

A jury viewing the video of the incident could not come to the conclusion that the force applied to Plaintiff by the officers was done maliciously and sadistically in order to cause harm. Rather, there is no genuine, material dispute of fact, even when viewing the evidence in the light most favorable to the Plaintiff, that force was not applied in a good faith effort to maintain or restore discipline. Further, there is no evidence to show that Plaintiff suffered actual injury as a result of the incident, and there is no evidence to support an inference that the officers wantonly inflicted pain upon Plaintiff. For all these reasons, the Benton County Defendants are entitled to summary judgment for Plaintiff's personal capacity excessive force claims.

## 2. Failure to Supervise or Train

Plaintiff asserts that:

Sheriff Holloway violated my 4th, 8th, and 14th amendments which forbids to deny any person within it's Jurisdiction the equal protection of the law and he failed to adequately train and supervise staff and protect me from the use of excessive force used by the Deputies that were all involved.

(Doc. 16 at 12).

A local government may be held liable if the failure to train or supervise the offending actor caused the deprivation. In *Parrish*, the Court set forth the requirements to establish governmental or official capacity liability based on a failure to train. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010). It stated that a government may be subject to liability for inadequate training of its employees where:

(1) the [county's] . . . training practices [were] inadequate; (2) the [county] was deliberately indifferent to the rights of others in adopting them, such that the "failure to train reflects a deliberate or conscious choice by [the county]"; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury.

*Id.* (citations omitted).

Even where it is established that only minimal training is received, "that finding alone will not satisfy a § 1983 claim for failure to train." *Id.*

> Instead, Plaintiff must demonstrate that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Plaintiff has made no such showing. The summary judgment record does not contain any evidence of a deficiency in the training of deputies or suggest a causal relationship between the failure to train and the alleged constitutional violation. The Court does "not believe that there is a patently obvious need to train an officer not to" use excessive force against a detainee. *Cf. Parrish*, 594 F.3d at 999 (no "patently obvious need to train an officer not to sexually assault women, especially where there is no notice at all that such behavior is likely"); *see also Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996) (failure to follow policy does not state a claim for relief under 42 U.S.C. § 1983).

The Benton County Defendants are entitled to summary judgment on Plaintiff's failure-to-supervise/train claims.

### 3. Retaliation

Plaintiff's Amended Complaint states that he was retaliated against when:

> [on] 2-23-18 . . . I told both deputies that I'm filing a lawsuit on the sheriff for other reasons. Due to the fact that I'm in stripes and he's not and that he's a law enforcement officer. Both Alex Tucker and Charley Long stated, 'the courts will believe us before they believe any inmate.' And I believe they are retaliating for the sheriff because I said it's on jail staff and the sheriff.

(Doc. 16 at 7).

Generally, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by

26

a different reason." *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001) (citing *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)). The retaliatory conduct itself need not be a constitutional violation to be actionable. Additionally, there is no independent injury requirement when retaliatory conduct is involved. *See Dixon v. Brown*, 38 F.3d 379, 380 (8th Cir. 1994). To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary firmness' from continuing in the activity;" and, (3) the adverse action was motivated at least in part by exercise of the protected action. *See L.L. Nelson Enterprise Inc. v. Cnty. of St. Louis, Mo.,* 673 F.3d 799, 807-8 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

The Court finds that there are insufficient facts presented in Plaintiff's Amended Complaint to demonstrate there is any genuine material dispute that the actions of the Benton County Defendants were retaliatory or amounted to retaliation. Accordingly, the Benton County Defendants are entitled to summary judgment on this claim.

### 4. Discrimination

Plaintiff also claims he was the subject of "discrimination/profiling," specifically stating, "[f]irst, both my knees are bruised up and I have swelling and black eye by the temple due to the deputies Alex Tucker and Charley Long told me that it was justified even though I know it wasn't. Deputies Long and Tucker smiled in my face and said that staff sergeant Adams will believe them over me and that cops stick together no matter what." (Doc. 16 at 9).

"'[T]he Constitution prohibits selective enforcement of the law based on considerations such as race . . . [and] the constitutional basis for objecting to intentionally

discriminatory application of laws is the Equal Protection Clause . . . .'" *Johnson v. Crooks*, 326 F.3d 995, 999 (8th Cir. 2003) (quoting *Wren v. United States*, 517 U.S. 806, 813 (1996)).  The Eighth Circuit has recognized that "encounters with officers may violate the Equal Protection Clause when initiated solely based on racial considerations." *U.S. v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005).  The Plaintiff has not set forth a cognizable claim regarding discrimination, nor has he presented evidence of such a claim.  The Benton County Defendants are entitled to summary judgment.

### 5.  Interference with Mail

Plaintiff's statement for relief states: "I also want to be able to receive our postal mail in person and not on a computer screen.  They are interfering with the mail here." (Doc. 16 at 8).  While inmates have a First Amendment right to free speech, including the right to send and receive mail, "confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment." *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 125 (1977).

"Prisoners' First Amendment rights encompass the right to be free from certain interference with mail correspondence."  *Davis v. Norris*, 249 F.3d 800, 801 (8th Cir. 2001).  "Interference with legal mail implicates a prison inmate's right to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."  *Davis v. Goord*, 320 F.3d 346, 351 (2nd Cir. 2003).  "A prison policy that obstructs privileged inmate mail can violate inmates' right of access to the courts." *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1988).

Restrictions on this First Amendment right are valid "only if [they are] (1) reasonably related to legitimate penological interests," such as security, order, or

rehabilitation and are (2) no greater than necessary to the protection of the governmental interest involved. *Turner v. Safely*, 482 U.S. 78, 89 (1987).

The Plaintiff complains only that mail is available on an electronic screen rather in in hard copy. He does not allege that he has been deprived of access to mail. However, evidence *has* been presented concerning the BCDC mail system and its intended goals of preventing contraband from entering the BCDC, while eliminating any issues of inadvertent interference of prisoner mail by BCDC staff. Because Plaintiff has failed to set forth a genuine, material dispute of fact concerning interference with his mail, and because the BCDC mail system is in place to address legitimate penological interests, the Benton County Defendants are entitled to summary judgment on this claim.[4]

### 6. Official Capacity Claims

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010). "[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish any liability on the employing governmental entity under section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted). To establish the existence of an unconstitutional policy, the Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the

---

[4] Having found the facts do make out a constitutional violation, there is no need to reach the issue of qualified immunity. *See Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).

municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

Here, Plaintiff has failed to meet proof with proof and provide evidence of a policy or custom of Benton County that contributed to the alleged violation of Plaintiff's constitutional rights. Accordingly, the Benton County Defendants are entitled to summary judgment on Plaintiff's official capacity claims.

## IV. CONCLUSION

For the reasons and upon the authorities discussed above, both Separate Defendant Heather Trimmer's Motion for Summary Judgment (Doc. 27) and the Benton County Defendants' Motion for Summary Judgment (Doc. 31) are **GRANTED.**

Accordingly, all of Plaintiff's claims against the Defendants are **DISMISSED WITH PREJUDICE**. A judgment consistent with this opinion will be entered.

**IT IS SO ORDERED** on this 25th day of March, 2019.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE